John SUSI, Plaintiff,

v.

**BELLE ACTON STABLES, INC.,** Harold Rosenberg, Jack Stahl and Rona Plastics Corporation, now known as Stahl Liquidating Corp., Defendants.

No. 61 Civ. 778.

United States District Court
S. D. New York.
March 20, 1967.

Casey, Lane & Mittendorf, New York City, for plaintiff, William E. Kelly, and Alan R. Wentzel, New York City, of counsel.

Julius Gerzof, Freeport, N. Y., for all defendants.

MANSFIELD, District Judge.

The factual background and history of this suit for conversion of certain race horses may be found in the opinion of the Second Circuit Court of Appeals reported at 360 F.2d 704 (2d Cir. 1966) remanding the case for recomputation of damages, and in the subsequent opinion of this Court at 261 F.Supp. 219 (S.D. N.Y.1966) resolving certain legal questions for the guidance of the parties in offering proof to be considered for such recomputation.

In view of the parties' stipulations accepting the findings of Judge Graven as to the value of the horses and agreeing that these values remained constant from August 2, 1960 through February 1961, there is no dispute about the fact

that the values of the horses on the date of conversion were as follows:

| Belle Acton | $40,000 |
| Wonderful One | 3,500 |
| Storm Moraka | 5,000 |
| Half interest in Esquire Direct | 2,750 |

Under the Court of Appeals' decision the damage to be awarded against defendants for conversion of each horse would be the value shown above for that horse less whatever stableman's lien William Haughton held on that horse at the date of conversion. As will be seen, establishing the amount of Haughton's lien on each horse has posed difficult proof problems. This Court has already held that the burden of proving his lien on each horse rests upon the defendants, and that under New York law the lien is a specific one on each animal, limited to expenditures for the care, feeding and maintenance of it alone, less any credits applicable to Haughton's bill for its care and feeding.

The record before Judge Graven reveals that Haughton *claimed* a lien in the sum of $32,000 for the aforementioned and various other horses but that except for an earlier $8,000 mortgage on Belle Acton acquired by Haughton from one Tuccio, Haughton's specific lien on each horse was not established in the proceeding before Judge Graven, probably for the reason that Judge Graven held that any lien obtained by Haughton could not be used to offset the damage award against the defendants, a holding later reversed by the Court of Appeals.

█ Faced with the burden of proving the amount of Haughton's specific lien on each horse, defendants offered no further proof, stating that they were treating Haughton's $32,000 "claim" as the amount of the lien. Notwithstanding this Court's rejection of that contention, defendants have continued to treat the lien as an indivisible one in the sum of $32,000 from which they offer to deduct $6,000 representing one-half of Haughton's charges for Esquire Direct. Plaintiff, on the other hand, introduced proof both of Haughton's charges to the account of *each* of the nine horses belonging to Landers (including the four horses here in question) and of payments which Haughton received on account of *all* nine horses belonging to Landers which were stabled with him. Since Haughton's records had been destroyed by termites, the proof consisted of schedules reflecting charges and credits taken from his records for the period up to April 30, 1960. Although he claimed liens for charges to August 2, 1960 and testified that there were additional charges and perhaps credits during the period between these two dates, he could not recall the amounts and his records, having been destroyed, were unavailable. Under the circumstances the Court accepts the schedule of charges incurred up to April 30, 1960 for each of the horses as the starting point for determining the amount of Haughton's lien on each horse and concludes that the defendants have failed to sustain their burden of proving that any net lien was incurred thereafter during the period up to August 2, 1960.[1]

The charges incurred by Haughton for each of the four horses here involved represent gross outlays for care and feeding, from which there must be deducted credits received by Haughton from time to time from Landers in order to arrive at Haughton's net lien on each horse. The only available schedules, however, while listing these credits, fail to allocate any of them to any of the nine horses that Landers had stabled with Haughton. Since some of the credits are attributable to horses which were not converted, the Court is faced with the problem of how

---

1. In the case of three of the horses, the setoff already exceeded or closely approached the value of the horse. As for the fourth horse, Belle Acton, Haughton's records show no charges since November, 1959. The Court, therefore, feels that no serious inequity has resulted from the inaccessibility of evidence.

these credits are to be allocated between the various horses, including each of the four here involved.

Plaintiff argues that each payment received by Haughton represents the winnings of a particular horse and should therefore be allocated to the account of that horse. He has supported this claim by demonstrating that most of the payments correspond exactly to the amounts of purses won by horses in this group at about the time the payments were made. See Appendix A hereto. Plaintiff's calculation according to his proposed method of allocation would result in damages of $34,484.13 before interest, or $2,205.38 more than the sum arrived at by the Court under the method described below. Defendant has presented no alternative calculation.

Though impressed with the close correlation that plaintiff has demonstrated, the Court believes a more conventional method of allocation would be appropriate in the circumstances. Ordinarily under New York law a debtor owing several accounts to a single creditor may designate the account to which a payment is to be applied. If the debtor fails to specify an application, the creditor is entitled to do so. Should both fail to act the Court will make that application which appears equitable in the circumstances. Foss v. Riordan, Sup., 84 N.Y.S.2d 224, 233 (Sup.Ct.1947), affd., 273 App.Div. 982, 79 N.Y.S.2d 515 (1948), appeal dismissed, 298 N.Y. 509, 80 N.E.2d 658 (1948).[2] Here there was no evidence that Landers ever made an allocation of the payments and clear testimony from Haughton that he had never made an allocation. Applying the above principles of New York law, the Court has concluded that the payments received each month from Landers should be applied first to discharge the oldest Landers' accounts on Haughton's books at the time the payments were received and then equally among the accounts of the same age.[3] Under this method we compute plaintiff's damages as follows:

| | | |
|---|---|---|
| Value of Belle Acton as found by Judge Graven | | $40,000.00 |
| Tuccio's Mortgage | $8,000.00 | |
| Net Charges | 2.46 | |
| Total Setoff | | 8,002.46 |
| Net Damages | | $31,997.54 |
| Value of Storm Moraka as found by Judge Graven | | $ 5,000.00 |
| Net Charges | | 4,718.79 |
| Net Damages | | $ 281.21 |
| Value of Wonderful One as found by Judge Graven | | $ 3,500.00 |
| Net Charges | | 4,102.63 |
| Net Damages | | $ 0.00 |
| Value of Esquire Direct as found by Judge Graven | | $ 5,500.00 |
| Net Charges | | 6,853.60 |
| Net Damages | | $ 0.00 |
| TOTAL DAMAGES | | $32,278.75 |

2. Cf. City of New York v. Idlewild Beach Co., 182 Misc. 205, 43 N.Y.S.2d 567 (City Court 1943), affd., 182 Misc. 213, 50 N.Y.S.2d 341 (Sup.Ct.App.Term 1944).

3. See Note 3 on page 296.

■ The fact that the charges against Esquire Direct exceed the value of the horse so that there is no recovery for its conversion makes it unnecessary to decide the date when or indeed whether it was converted. As for the other horses, while plaintiff contends that they were converted sometime on or about September 12, 1960, when certificates of registration were obtained by the defendants, it is doubtful whether this conduct standing alone constituted a conversion especially since there is inadequate evidence to establish that such certificates represented documents of title within the meaning of § 1–201(15) of the Uniform Commercial Code. However, the proof is clear that by the end of February 1961 the defendants had exercised such dominion and control over the horses as to constitute a conversion. Accordingly, the Court finds that the horses were converted on or about February 28, 1961.

■■ The defendants have asked us not to award interest in this case. Interest is customarily awarded in cases of conversion, as defendants concede in their brief. The unreported case cited by defendants in support of their request is wholly distinguishable. There the Town of Freeport was permitted both to keep a generator it had purchased and recover the money it had paid for it. The present case would be analogous only if defendants were being required to surrender the horses they converted as well as pay their value in damages.

The plaintiff shall have judgment for $32,278.75 and interest from February 28, 1961.

So ordered.

---

3. For example, in April 1959 the charges were as follows:

| | |
|---|---:|
| Belle Acton | $ 944.52 |
| Danny Dares | 646.63 |
| Esquire Direct | 641.63 |
| Esquire Gold | 0.00 |
| Esquire Mamie | 54.45 |
| Storm Moraka | 1,342.40 |
| Sudden Counsel | 646.81 |
| Timely Pick | 725.84 |
| Wonderful One | 853.46 |

Also in April there were credits or payments on behalf of the Landers' accounts of $4,325.00. This amount was first divided equally among the horses whose accounts showed a balance due, resulting in an allocation of $540.63 to the account of each such horse. This was $486.18 more than was required to pay the account of the horse, Esquire Mamie, in full. This excess amount was divided among the accounts of the remaining seven horses resulting in a further reduction of $69.45 in the balance due on each. Since balances still remained due on these seven accounts, the Court applied the payments received in May, 1959 first to them. The $5,013.96 received in May provided enough to pay off all of these accounts and leave a surplus. The Court then tabulated the charges against each horse for May, and the remainder of the May payments was offset against these accounts, equally, with any surplus over the amount required to balance an account being divided among the remaining accounts. First the June and then the July payments were applied to eliminate any balances. The Court then tabulated the June charges against each horse, allocated the remainder of the July payments among them equally with any excess over the amount required to balance an account being allocated among the remaining accounts, and made a similar allocation of the payments of future months until the June accounts were balanced. This process was continued until all of the payments received by Haughton on behalf of Landers were exhausted. After this the Court simply totaled the amount of the subsequent charges on each horse to arrive at the amounts of the liens.

## APPENDIX A

| | Credits Applied to G. Landers Account | Name of Horse | Date Purse Won in Same Amount as Credit |
|---|---|---|---|
| April, 1959 | $ 300.00 | Wonderful One | April 1, 1959 |
| | 1,000.00 | Storm Moraka | April 2, 1959 |
| | 440.00 | Esquire Direct | April 4, 1959 |
| | 180.00 | Esquire Direct [1] ($360) | April 17, 1959 |
| | 240.00 | Sudden Counsel | April 20, 1959 |
| | 1,000.00 | Storm Moraka | April 22, 1959 |
| | 625.00 | Wonderful One | April 23, 1959 |
| | 360.00 | Esquire Direct [2] | April 24, 1959 |
| | 180.00 | Sudden Counsel [3] | April 29, 1959 |
| May, 1959 | 4,446.43 | Esquire Direct | May 9, 1959 |
| | 567.53 | Esquire Direct [4] ($767) | May 16, 1959 |
| June, 1959 | 767.15 | Esquire Direct | June 20, 1959 |
| July, 1959 | 100.00 | Sudden Counsel | July 8, 1959 |
| | 1,000.00 | Storm Moraka | July 8, 1959 |
| | 550.00 | Sudden Counsel | July 13, 1959 |
| | 3,000.00 | Esquire Direct | July 17, 1959 |
| | 1,200.00 | Storm Moraka | July 18, 1959 |
| | 1,100.00 | Sudden Counsel | July 27, 1959 |
| | 312.00 | Storm Moraka | July 27, 1959 |
| August, 1959 | 1,067.04 | Esquire Direct | August 22, 1959 |
| Sept., 1959 | 1,375.00 | Esquire Direct | Sept. 5, 1959 |
| March, 1960 | 360.00 | Storm Moraka | March 30, 1960 |
| April, 1960 | 375.00 | Esquire Gold | April 5, 1960 |
| | 180.00 | Danny Dares | April 5, 1960 |
| | 725.00 | Storm Moraka | April 13, 1960 |
| | 348.00 | Storm Moraka | April 30, 1960 |

1. Between April 4 and April 20, 1959, the horses under Haughton's care won the following amounts: Wonderful One, $1,250 and $625; Storm Moraka, $1,000; Esquire Direct, $360. Since the $180 "credit" is exactly half of the $360 won by Esquire Direct, it is the most likely inference that the $180 came from this purse.

2. The $640 figure for Esquire Direct on April 24 which appears on Exhibit 3 is an error. The U.S.T.A. corrected this error to reflect the actual purse won, $360. The correction appears on the copy of Exhibit 3 annexed to plaintiff's Request for Admissions.

3. The only horse to earn any money between April 24 and the end of the month was Sudden Counsel, which won $240 on April 29, 1959.

4. The only horses to earn at least $567.53 between May 9 and the end of the month were Sudden Counsel, which won $1,000 on May 25, and Esquire Direct, which won $767 on May 16 (U.S.T.A. records do not carry cents). The inference is compelling that this credit came from Esquire Direct's purse.