**North Emerson WEST, Plaintiff,**

v.

**Walter W. REDMAN, et al., Defendants.**

**Civ. A. No. 78–14.**

United States District Court,
D. Delaware.

Jan. 11, 1982.

Douglas A. Shachtman, Wilmington, Del., for plaintiff.

Edward F. Kafader, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

OPINION

STAPLETON, District Judge:

In this Section 1983 action, plaintiff sought individual damages for alleged con-

stitutional violations, including physical and psychological mistreatment, by defendant prison guards and officials of the Delaware Correctional Center ("DCC"). Plaintiff was also certified as a class representative for a class seeking injunctive relief against disciplinary procedures at DCC alleged to violate plaintiffs' due process rights. In April 1980, on the eve of trial, plaintiff West's damage claim was settled for $6,000. The class claim for injunctive relief was also provisionally settled, pending a trial implementation period for new procedures. In December 1980, I referred the remaining matters in this action to Magistrate Richard Powers, pursuant to 28 U.S.C. § 636.

Although initially filed as a *pro se* complaint, plaintiff was thereafter represented by Douglas A. Shachtman, Esquire, who was then employed by Community Legal Aid Society, Inc. ("CLASI"). This matter now comes before the Court pursuant to defendants' objections to the Magistrate's October 29, 1981 Order granting counsel $52,714 in interim attorney's fees.

## I

Before addressing the substance of defendants' objections, it is necessary to resolve a procedural issue. In filing their objections, defendants have treated the Magistrate's Opinion and Order on attorney's fees as proposed findings and recommendations under 28 U.S.C. § 636(b)(1)(B). Plaintiff contends, however, that the Magistrate's Order should be treated as it was styled—as an interim order—and, therefore, that defendants' objections should be treated as an appeal under 28 U.S.C. § 636(b)(1)(A). The choice between these provisions is important because of the different standard of review. Proposed findings and recommendations under Section 636(b)(1)(B) are subject to "de novo determination" under Section 636(b)(1)(C); a magistrate's order under Section 636(b)(1)(A) is reviewable under a "clearly erroneous or contrary to law" standard.

In enacting the Federal Magistrate's Act, 28 U.S.C. § 631, *et seq.*, Congress sought to lighten the increasing workload of federal district judges. *See Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). Thus, Section 636(b)(1)(A) of the amended Act, by referring to "any pre-trial matter", created a broad, general category of matters that could be assigned to magistrates subject only to a lenient standard of review. Specifically excluded from this general category, however, were various "dispositive" motions; these were included in a second, separate category under Section 636(b)(1)(B) whereby the magistrate's recommendations were subject to the more rigorous de novo standard of review. By thus preserving the ultimate plenary authority of the district court in case-dispositive matters, Congress was sensitive to the potential Article III [1] constraints on the decisionmaking power of magistrates. *See United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).[2]

The "disposition" of prisoner petitions is also included within the coverage of Section 636(b)(1)(B). I do not take this to mean, however, that every issue within a prisoner proceeding referred to a magistrate be subject to the de novo standard of this section. If this were true, then non-dispositive, pre-trial matters in prisoner litigation would require greater review than similar matters referred to the Magistrate in other litigation; clearly this is not what Congress intended. At the same time, an order of attorney's fees, even an interim one, does not seem to fall within the "pre-trial" language of Section (b)(1)(A), since it is awarded to *prevailing* parties.[3] The question therefore becomes whether the Magistrate's Order here involves the "disposition" of a prisoner petition and thus falls within Section (B) or whether it is more like a non-dispositive, pre-trial matter and thus falls within Section (A).

---

1. U.S.Const. art. III.

2. *See generally* Note, *Article III Constraints and the Expanding Civil Jurisdiction of Federal*

*Magistrates: A Dissenting View,* 88 Yale L.J. 1023 (1979).

3. *See* 42 U.S.C. § 1988 (1976).

■ I conclude that a Magistrate's Order awarding statutory attorney's fees is properly reviewed under Section 636(b)(1)(B) because it is essential to a full disposition of the petitioner's claim and the defendants' liability. The Third Circuit has recently made clear that rather than being a collateral matter, an award of attorney's fees is integral to the merits of an action. *Croker v. Boeing*, 662 F.2d 975 at 983 (3d Cir. 1981) (en banc). Like the award in *Croker*, the Magistrate's award of attorney's fees here is "clearly part of the overall relief sought and granted", *Id.* at 984, and is therefore part of the "disposition" of this prisoner petition.

Having concluded that the Magistrate's decision here falls within Section (b)(1)(B), I now review the Magistrate's Order and the defendants' objections thereto under the applicable standard of Section (b)(1)(C).

## II

In the course of determining that $52,714 was a "reasonable attorney fee" for this litigation, Magistrate Powers conducted an evidentiary hearing, calculated a lodestar based on hours reasonably invested at a reasonable hourly rate, and then increased that lodestar by a "contingency factor" and a "quality factor". *See Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) (en banc) (*Lindy II*). Defendants' objections do not challenge the computation of the lodestar itself; rather, they attack the application of both the contingency and quality factors.

### A.

The Magistrate increased the lodestar of $28,494 by a contingency factor of 75%. In reaching this 75% contingency figure, the Magistrate applied the guidelines announced in *Lindy II, supra*, 540 F.2d at 117, by considering the plaintiff's burden, the risks assumed in developing the case, and the delay in receipt of payment. Defendants do not attack the validity of the 75% figure based on the factors considered by the Magistrate; rather, their argument is

that application of *any* contingency factor is inappropriate in a case such as this one, where plaintiff was represented by a non-profit organization like CLASI. Thus, defendants' assert, "any increase on [sic] the lodestar based upon the contingent nature of the case should be made only if the lawyer or his firm has assumed substantial financial risk by undertaking representation of the case."

It is settled law in this Circuit that legal services attorneys are eligible for an attorney's fee award. *Miller v. Apartments and Homes of N. J., Inc.*, 646 F.2d 101, 112 (3d Cir. 1981). *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). This the defendants do not dispute, conceding that CLASI is entitled to the basic lodestar; rather, it is CLASI's eligibility for a contingency increase that defendants contest. While no cases from within the Third Circuit have expressly decided this issue, several, by considering or mentioning the contingency factor in the context of an award to legal services attorneys, have certainly implied that these organizations are entitled, where appropriate, to such an award. *See, e.g., Miller*, 646 F.2d at 113, n. 14; *Rodriguez*, 569 F.2d at 1247, n. 28; *Vecchione v. Wohlgemuth*, 481 F.Supp. 776, 794–5 (E.D.Pa.1979); *White v. Beal*, 447 F.Supp. 788, 798 (E.D.Pa.1976). *But cf. Barrett v. Kalinowski*, 458 F.Supp. 689, 706–708 (M.D.Pa.1978).

■ I do not consider this question a particularly difficult one. The statute under which the Magistrate made his award was intended by Congress "to encourage private enforcement of [certain] individual rights and to deter [certain] socially harmful conduct." *Rodriguez v. Taylor*, 569 F.2d at 1245. The potential for an award under the statute accomplishes this objective in the context of private representation by removing disincentive to suit on Congressionally favored claims which might otherwise tip the cost-benefit calculations of the injured party in favor of foregoing any remedy. While the Congressional objective is obtained in a somewhat different manner

in the context of representation by a legal services organization, awards are made for such representation because the same potential for influencing cost-benefit calculations is present.[4]

In the context of legal services representation, the legal services organization participates in the decision as to whether and how far a particular claim will be pursued. As recent history has dramatically demonstrated, such decisions must be made within a framework of limited resources. Because funding is limited and demand for representation exceeds the ability to provide it, decisions must constantly be made on the costs and benefits of various alternative time allocations. The potential of a counsel fee award in a suit on a Congressionally favored claim obviously increases the relative attractiveness of that investment of resources over alternative investments. It is in this way that "the award of fees to legal aid offices and other groups furnishing *pro bono* representation promotes the enforcement of the underlying statutes as much as an award to privately retained counsel." *Rodriguez v. Taylor*, 569 F.2d at 1245.

In the private representation context, the law recognizes the fundamental fact that the potential for a fee award based solely on hours spent times hourly rate will often not provide sufficient incentive to induce attorneys to undertake representation of clients who are unable to pay for their services. The potential of an additional award in the form of a contingency allowance is provided to compensate for the risk assumed by the attorney that this time investment may go uncompensated. By keying the size of any such allowance to the probability of success of the particular claim, the contingency allowance encourages attorneys to take the "harder" as well as the "easier" cases. In the legal service representation context, of course, all statutory fee litigation is undertaken on a contingent basis. Moreover, one can assume that the risk of an uncompensated invest-

ment is generally high since a legal services organization ordinarily is authorized to take only those cases which will not be taken by members of the private bar. In this context, it would be unrealistic to assume that legal service resources will be consistently allocated to Congressionally favored claims in the absence of some potential of compensation for the risk that the claim will be unsuccessful. Accordingly, I conclude that the Magistrate was not foreclosed from making a contingency factor award to CLASI.

■ With respect to the time claimed when Shachtman was in private practice,[5] the defendants claim that no contingency increase should be awarded because, at that point in time, the plaintiff's chances of success were virtually assured. Regardless of whether this assessment is correct, I conclude that the Magistrate's rejection of this argument was proper. *Lindy II* mandates that the contingency of success should be viewed at the time of filing suit. To adjust a lawyer's contingency fee at different stages of the litigation would defeat the purpose of rewarding an attorney for his skill. For it will often be true, as it appears in this case, that changes in the likelihood of success result directly from the skillful work by the attorney involved.

## B.

■ In arriving at his decision to add 10% for the quality factor, the Magistrate considered the sub-factors enumerated in *Lindy II* and based this increase on his evaluation of the result achieved. In reviewing that determination, I note that a quality adjustment is only to be awarded for "an unusual degree of skill," *Lindy I*, 487 F.2d at 168, and that a consideration of quality already inheres in the lodestar itself: "counsel who possesses or who are reputed to possess more experience, knowledge, and legal talent generally command hourly rates superior to those who are less endowed." *Lindy II*, 540 F.2d at 117.

**4.** *See* Note, *Awards of Attorney's Fees to Legal Aid Offices*, 87 Harv.L.Rev. 411 (1973).

**5.** Shachtman left CLASI in January 1980, and took this case with him. Sixty of the 398 hours claimed were for work in private practice.

Here, as the Magistrate acknowledged, it is difficult to say that the injunctive relief, although certainly a good result, is more than would have been expected from this litigation.[6] The primary support for the 10% increase is, accordingly, the $6,000 damage award. I cannot say, however, that a $6,000 settlement indicates an unusual degree of skill in the context of this case in which defendants faced a long trial—and the consequent attorney's fees of trial time for defense counsel regardless of result, and for plaintiff's counsel in the not unlikely event of a loss.

Having reviewed the record, I am convinced that Mr. Shachtman has provided conscientious and effective legal assistance. I am not persuaded, however, that the record evidences a degree of skill significantly above that expected for "lawyers of the caliber reflected in the hourly rates." *Lindy II*, 540 F.2d at 118.

---

6. Since the measures implemented on a trial basis have not as yet been finalized, the result achieved with respect to injunctive relief actually remains unclear. Neither party, however, asserts that this should affect the award of attorney's fees at this time.

Once these procedures are finalized, it conceivably may be appropriate to make a further adjustment to the lodestar based, for example, on furthering the "important substantive purposes of the Civil Rights Act." *See Hughes v. Repko*, 578 F.2d 483, 492 (3d Cir. 1978) (Garth, J. concurring).