YANKEE BANK FOR FINANCE & SAVINGS, FSB (Now the Federal Deposit Insurance Corporation, In Its Capacity as Receiver for Yankee Bank for Finance & Savings, FSB), Plaintiff,

v.

TASK ASSOCIATES, INC., Hanover Square Associates–Two Limited Partnership, Delhi Steel Corp., Lenehan & Sawicke, Inc., Bianchi Excavating, Inc., Spensieri Painting Co., Inc., Tipperary Heating & Plumbing Corp., Carpet Wholesale, Inc., WCA Roofing & Sheet Metal Co., Inc., Raynor Overhead Door Sales Co., Inc., B & P Ceramic Tile Co., Edward Schalk & Sons, Inc., Ajay Glass & Mirrors Co., Inc., Pro Masonry Corporation, Midstate Elevator Co., Inc., Hosek Contractors, Inc., d/b/a Eastern Painting Co., Inc., Armani Plumbing & Mechanical, Inc., Commercial Air Control, Inc., Simone Electrical Contractors, Inc., Donald J. Judd d/b/a Judd Associates, B.R. Johnson, Inc., the People of the State of New York, C.G. Boone, Inc., Stonefield Cleaning and Travers Maintenance Service, Inc., Consolidated Electrical Distributors,

Inc., Trading as Ced. Baldwin–Hall, MCK Building Associates, Inc., Bohem Manufacturing Company, Inc., Surface Renewal Corporation, and Robertson, Strong Apgar Architects, P.C., Defendants.

No. 88–CV–224.

United States District Court,
N.D. New York.

March 30, 1992.

Hancock & Estabrook, Syracuse, N.Y., for plaintiff; Thomas C. Buckel, Jr., of counsel.

Menter Rudin & Trivelpiece, Syracuse, N.Y., for Consol. Elec.; Antonio E. Caruso, of counsel.

Harris Beach Wilcox Rubin & Levey, Rochester, N.Y., for Hanover Square Associates–Limited; Bruce L. Maas, of counsel.

Welch Welch & Carr, Syracuse, N.Y., for Hosek Contractors; Anthony P. Adorante, of counsel.

Robert W. Hartnett, Syracuse, N.Y., for Lenehan & Sawicke.

Hiscock & Barclay, Syracuse, N.Y., for Raynor Overhead Door; Peter Hogan, of counsel.

John L. Stinziano, Esq., E. Syracuse, N.Y., for Robertson, Strong Apgar Architects.

MacKenzie Smith Lewis Lewis Michell & Hughes, Syracuse, N.Y., for Ajay Glass; Alfred W. Popkess, of counsel.

Bryant O'Dell and Basso, Syracuse, N.Y., for Armani Plumbing, Schalk, Simone, WCA Roofing & MCK Bldg. & B & P Ceramic; Robert Silkey, of counsel.

Bond Schoeneck & King, Syracuse, N.Y., for Bianchi, Delhi Steel, Spensieri Painting & Tipperary Heating; Joseph J. Lawton, of counsel.

Freeman Mintz Hagner & Deiches, Haddonfield, N.J., for Bohem Mfg.

Devorsetz Stinziano & Smith, Syracuse, N.Y., for C.G. Boone; Mark Grobosky, of counsel.

Robert Abrams, Atty. Gen., of the State of N.Y., Albany, N.Y., for People of the State of New York; Alan Hegeman, Asst. Atty. Gen., of counsel.

Carrigan & Ryan, Syracuse, N.Y., for Surface Renewal Corp.; William F. Carrigan, Jr., of counsel.

Robert Woodford, Syracuse, N.Y., Referee.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

## BACKGROUND

Familiarity with this case is assumed. Therefore only the facts necessary to an

understanding of the issues raised by Magistrate Judge DiBianco's January 28, 1991, report-recommendation and the objections thereto will be set forth herein.

This court previously granted the motion for summary judgment of foreclosure and sale on the SA & K building brought by plaintiff, the Federal Deposit Insurance Corporation ("FDIC"),[1] as against one of the defendants, Hanover Square Associates–Two Limited Partnership ("HSA–II"). That building has since been sold at a mortgage foreclosure sale, and the $505,000.00 in sale proceeds are in a trust account pending further court order. In its simplest terms, the controversy now centers on how much, if any, of those sale proceeds the FDIC and/or the various defendant mechanic's lienors[2] should receive.

At the direction of this court, on August 29, 1990, Magistrate Judge DiBianco ("the Magistrate") conducted a hearing to determine "(A) the amount actually expended toward the purchase of the SA & K building by Yankee Bank and (B) the validity and reasonableness of the mechanic's liens." *Yankee Bank for Finance & Sav., FSB v. Task Assoc., Inc.*, 731 F.Supp. 64, 72 (N.D.N.Y.1990) ("*Yankee Bank III*"). On January 28, 1991, the Magistrate issued a report-recommendation; and the FDIC and the defendants timely filed objections thereto.

## I. Report–Recommendation

The Magistrate recommended that the court find "that the amount expended for the purchase of the SA & K property be $464,172.02." *Yankee Bank for Finance & Sav., FSB v. Task Assoc., Inc.*, 88–CV–224 slip op. at 14 (Report–Recommendation January 28, 1991) ("Report"). That amount reflects a purchase price finding of $610,000.00 "minus the amount that Ticor disbursed back to Task after the closing (i.e. $106,327.98) and minus the $39,500.00 that was not utilized for acquisition of the property." *Id.* at 11. The Magistrate further recommended "that the FDIC be awarded the above amount with interest calculated from the date of the judgment of foreclosure and sale as first priority on the funds received from the sale of the building, ..." *Id.* at 14–15. Lastly he recommended "that the remainder of the money, if any, be distributed to the mechanic's lienors based on their priorities." *Id.* at 15.

The $464,172.02 figure is not some arbitrary amount randomly selected by the Magistrate. Rather, the Magistrate evidently arrived at that figure, in part, based upon several documents. First, he relied upon a letter from Ticor Title Guarantee ("Ticor") to Matthew Antell,[3] which states, in part, that pursuant to Mr. Antell's request, "[t]he $610,000.00 wire into your account was distributed as follows: ...." Ex. 47 at 1.[4] The letter goes on to set forth a break down of the distributions of the $610,000.00, including $432,820.52 which was paid to Breger, Gorin & Leuzzi, the seller's attorneys.[5] The Magistrate also relied upon the mortgage in the amount of $2,600,000.00 between Task, as the mortgagor, and Home Savings Bank,

---

1. Previous decisions of this court make clear that although Yankee Bank for Finance & Savings, FSB (or "the Bank") was originally the plaintiff in this action, the FDIC, as receiver for that bank, is now the plaintiff. *See Yankee Bank for Finance & Sav., FSB v. Task Assoc., Inc.*, 88–CV–224 slip op. at 4 n. 1, 1989 WL 87430 (August 4, 1989) ("*Yankee Bank II*"); and *Yankee Bank for Finance & Sav., FSB v. Task Assoc., Inc.*, 693 F.Supp. 1400 (1988).

2. Unless otherwise stated, all references to the defendants herein shall mean only to those defendants who have commonly been referred to during the course of this litigation as the mechanic's lienors. (These defendants provided the labor and materials for renovation of the SA & K building and were not compensated. They therefore filed mechanics' liens on the subject property.)

3. Task Associates, Inc. ("Task") and HSA–II were the business entities engaged in the acquisition and renovation of the SA & K building. Matthew Antell, one of the defendants in this action, is a real estate developer and was a corporate officer of Task and a general partner of HSA–II.

4. Plaintiff's exhibits were marked with numbers and the defendants with letters.

5. *See* Ex. 42 (portion designated as Rider to Contract of Sale) at 4, ¶ 9.

FSB ("Home Bank"),[6] executed October 1, 1984, wherein it is handwritten that "the balance of $610,000.00 is advanced independently, the date hereof [October 1, 1984]...." Ex. 2. Finally, the Magistrate noted that "[t]he exhibits also reflect that $610,000.00 was in fact wired from Yankee Bank on October 2, 1984,...." *Id.* Although the Magistrate did not designate which specific exhibits support that statement, presumably he relied upon exhibits 18 and 30 because those are the exhibits reflecting a $610,000.00 wire transfer on October 2, 1984. Robert Sellers, an FDIC witness and the only witness to testify for any of the parties, testified that that amount was wired to Ticor. Tape Recording Hearing (November 29, 1989). Based upon the evidence just described, the Magistrate concluded that "[i]t is clear that the $610,000.00 went from Yankee Bank to Ticor Title Guarantee for the purpose of purchasing the property [SA & K building]." Report at 8.

The Magistrate rejected the defendants' argument that "because the sale of the property may have been orchestrated with the improper purpose of avoiding taxes, the FDIC should not be able to take advantage of this wrong." *Id.* The Magistrate observed that, "the FDIC certainly was not party to any misrepresentation of the purchase price if such a misrepresentation did occur." *Id.* at 8–9. In addition, referring to *Langley v. Federal Deposit Insurance Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Magistrate reasoned that "to hold the FDIC responsible for whatever improper transaction, would be to subvert all the existing policies that apply to the FDIC." Report at 9.

The defendants also argued unsuccessfully before the Magistrate that whatever purchase price was determined, various sums should have been offset against that amount. The obvious effect of such offsets, if allowed, would be to reduce the extent of the FDIC's first priority lien. The first offset claimed by the defendants was the $150,000.00, which HSA–II placed in an escrow account with Yankee Bank on

approximately August 22, 1986. According to the defendants, that sum was placed in escrow for their benefit. The defendants maintain that the money from the escrow account was not used for that purpose; but it was used instead to reduce the debt. Thus, they believe that the purchase price should be reduced by $150,000.00 plus interest.

The defendants also sought a $40,000.00 offset for the amount of the down payment on the subject property. The defendants contended that that amount should be offset because the down payment did not come from funds advanced by Yankee Bank. The Magistrate declined to recommend a reduction of this amount, explaining that "although it is true that the initial check for $40,000.00 did not come from funds sent by the Bank, it does not change the fact that $464,172.02 was disbursed from the $610,000.00 that was sent from the bank." *Id.* at 13. The third and final offset urged by the defendants was in the amount of $65,000.00, supposedly representing the amount paid by Antell on the principal in 1986. Without any discussion, the Magistrate found no support for that reduction. *Id.* at 14.

## II. Objections

The parties' objections can be succinctly stated: the FDIC contends that the court should find that the amount actually expended to purchase the SA & K building is more than that proposed by the Magistrate and the defendants contend that the amount should be less. The defendants' objections can be divided into three broad categories: (1) evidentiary; (2) application of the *D'Oench* doctrine; and (3) failure to offset. The FDIC's objections are twofold. First, the FDIC objects on the basis that the Magistrate incorrectly calculated the interest accrual date. Second, the FDIC contends that the Magistrate improperly failed to take into consideration the purchase money mortgage as part of the purchase price. All of those objections will be addressed herein.

6. Home Bank was the predecessor to Yankee Bank.

**76**

## DISCUSSION

### I. Standard of Review

■ The first issue presented is a procedural one and that is which standard of review applies: a clearly erroneous standard or a *de novo* standard. Ordinarily the applicable standard of review is not a difficult issue and can be determined by examining the statutory basis for the referral to the magistrate. That is, if the district court is reviewing a magistrate judge's order under 28 U.S.C. § 636(b)(1)(A), then the standard is whether such order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) (West Supp.1991).[7]

If, on the other hand, the district court is reviewing a magistrate judge's proposed findings of fact and recommendations under 28 U.S.C. § 636(b)(1)(B), *de novo* review must be employed.[8] The difficulty here arises from the fact that at first glance, in its present posture, this case does not fall neatly into either § 636(b)(1)(A) or § 636(b)(1)(B). Additionally, when this matter was referred to Magistrate Judge DiBianco on the issue of actual expenditure, this court did not mention 28 U.S.C. § 636. And when this case was previously referred to the Magistrate on other issues, the order simply directed the Magistrate to take evidence, and make a report-recommendation pursuant to 28 U.S.C. § 636; no particular subsection of that statute was specified.

Defendants apparently thought that the court's referral of this matter was based upon 28 U.S.C. § 636(b)(1)(A), as they suggest, without any analysis, a clearly erroneous standard of review—the standard of review for matters referred under that statute. Defendants' reliance on the clearly erroneous standard is misplaced, however. Although the court did not specify the basis for referring the expenditure issue to the Magistrate, it clearly did not intend that 28 U.S.C. § 636(b)(1)(A) form the basis for the referral, because that section is limited to referrals of non-dispositive, pre-trial matters. *See also* Fed. R.Civ.P. 72(a) ("A magistrate to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter.").[9]

The remaining possibilities for referral are 28 U.S.C. § 636(b)(1)(B) or 28 U.S.C. § 636(b)(3). Even though § 636(b)(1)(B) appears to be limited in scope to referrals of one of the eight dispositive motions excepted from § 636(b)(1)(A), courts have not so limited the application of that statute. In *West v. Redman*, 530 F.Supp. 546 (D.Del. 1982), for example, the district court held that a magistrate's order awarding interim attorney's fees should be reviewed under the *de novo* standard, rather than the clearly erroneous standard, because such order was "essential to a full disposition of the petitioner's claim and the defendants' liability." *Id.* at 548. Likewise, in the present case, resolution of the issue of the amount actually expended to purchase the SA & K building is essential to a full disposition of the parties' various claims, counterclaims and cross-claims. Therefore,

---

**7.** In full, that statute reads as follows:

Notwithstanding any provision of law to the contrary—

a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.
28 U.S.C. § 636(b)(1)(A) (West Supp.1991).

**8.** Specifically, that statute provides, "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (West Supp.1991).

**9.** "This provision implements the legislative mandate of Section 636(b)(1)(A)." 12 C. Wright & A. Miller, Federal Practice and Procedure § 3076.3 (Supp.1991).

because the issues referred to Magistrate Judge DiBianco are essential to and an integral part of the full disposition of this case, the court will engage in *de novo* review.

Moreover, the timely filing of objections has also been recognized as triggering *de novo* review under § 636(b)(1). *See, e.g., Longmire v. Guste,* 921 F.2d 620, 623 (5th Cir.1991) ("Longmire filed written objections to the magistrate's report and was entitled to a *de novo* review by an Article III judge as to those issues to which an objection is made.") (citation omitted); *McCarthy v. Bronson,* 906 F.2d 835, 840 (2d Cir.1990), *aff'd on other grounds,* —— U.S. ——, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) ("[S]ubsection 636(b)(1), ... requires *de novo* review of any proposed findings to which objection was made.") Thus, the fact that these parties timely filed objections provides further support for the court's decision to proceed under a *de novo* standard of review. Finally, even if referral of the expenditure issue is deemed to be a referral under 28 U.S.C. § 636(b)(3),[10] the *de novo* standard of review would still govern. *See Aluminum Co. of America, Badin Works v. United States Environmental Protection Agency,* 663 F.2d 499, 502 n. 8 (4th Cir.1981). Thus, regardless of whether the referral of the expenditure issue is treated as a referral under § 636(b)(1)(B) or under § 636(b)(3), *de novo* review by this court is appropriate.

*De novo* review requires the court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (West Supp.1991); *see also* Fed.R.Civ.P. 72(b) ("The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate's disposition to which specific written objection has been made in accordance with this rule."). The court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate." 28 U.S.C.A. § 636(b)(1) (West Supp.1991). The Second Circuit in *Grassia v. Scully,* 892 F.2d 16 (1989), addressed the meaning of *"de novo* review" within the context of § 636(b)(1), explaining that "the phrase de novo *determination* in section 636(b)(1), as opposed to de novo *hearing,* was selected by Congress 'to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.'" *Id.* at 19 (emphasis in original) (quoting *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980)). Thus, as the Second Circuit has recognized, "[t]he statutory language of § 636(b)(1)(B) affords the district court broad latitude in considering the magistrate's recommendation." *Id.*

■ *De novo* review under § 636(b)(1)(B) does not, however, require that the district court "rehear the contested testimony in order to carry out the statutory command to make the required 'determination.'" *Raddatz,* 447 U.S. at 674, 100 S.Ct. at 2411. Several courts have held, though, that the district court must, " 'at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing.'" *Branch v. Martin,* 886 F.2d 1043, 1046 (8th Cir.1989) (citations omitted); *see also Pedraza v. Shell Oil Co.,* 724 F.Supp. 1, 2 (D.Mass.1989) (and cases cited therein). Indeed the Eighth Circuit has gone so far as to deem it reversible error, remanding, and refusing to reach the merits of an appeal, because "the absence of a transcript or, alternatively, a tape recording, of the evidentiary hearing made de novo review impossible." *Branch,* 886 F.2d at 1046. More recently, in *Taylor v. Farrier,* 910 F.2d 518 (8th Cir.1990), the Eighth Circuit again refused to reach the merits of an appeal and remanded the case because there was no showing that the district court had reviewed either a transcript or a tape recording of the evidentiary hearing before the magistrate. Consequently, in an effort to avoid reversible error, at least with respect

---

**10.** That statute allows a magistrate to be assigned "such additional duties as are not inconsistent with the constitution and laws of the

United States." *See* 28 U.S.C. § 636(b)(3) (West Supp.1991).

to the scope of review undertaken by this court, the court has carefully listened to the tape recordings of all of the relevant proceedings before the Magistrate,[11] as well as examined the numerous documents which were made a part of the record.

*De novo* review was made particularly arduous in this case by the that fact that at the August 29, 1990, hearing on the expenditure issue, for the most part, counsel relied upon documents received into evidence in prior proceedings; yet at no time during that hearing did counsel specify upon which previously admitted document (or portion thereof) they were relying. So, not only did the court listen to the tape recordings of the August 29, 1990, hearing, but it also listened to tape recordings of the November 8, 1989, hearing, and the tape recordings of the continuation of that hearing, conducted on November 29, 1989.

While the court appreciates and understands the efforts by counsel to streamline this already protracted litigation, in the future counsel should be mindful of the importance of making a record which easily lends itself to what is essentially appellate review by this court. Specifically the court suggests, that as a matter of good practice, counsel set forth on the record exactly which pieces of evidence and/or testimony they are relying upon to support a given proposition, as well as the basis for such admissions. As will be seen, counsel should also be aware of the pitfalls inher-

ent in simply offering numerous documents into evidence without being cognizant of whether a proper foundation exists for their admission.

## II. Defendants' Objections

### A. Evidentiary

#### 1. Ticor Title Guarantee Letter

The first evidentiary objection by the defendants pertains to the Magistrate's reliance on exhibit 47—the January 2, 1985, letter of William Bradt, Ticor's Clearance Officer, to Matthew Antell ("the Ticor letter"). The defendants contend that the Magistrate's reliance on that document to establish a purchase price of $610,000.00 was "clearly erroneous"[12] because (1) there was no foundation for the receipt of that document as a business record under Fed.R.Evid. 803(6);[13] and (2) nowhere in that exhibit does it specify that disbursed funds were used for the purchase of the SA & K building.

■ Before analyzing the defendants' objections to the use of the Ticor letter, the court is compelled to comment upon the fact that at the hearing the defendants did not object to the receipt of this document into evidence. The defendants now state that they did not object "because it was thought that the Exhibit was necessary to properly understand the references to various exhibits, including Exhibit 47, in the Jaroch deposition."[14] Defendants' Objec-

---

**11.** The court notes in passing that, through no fault of counsel, the tape recordings are of inferior quality. Thus, at times, a small portion of testimony by Robert Sellers was inaudible; and, in a few rare instances, the court was not able to hear the exact questions being posed.

**12.** Defendants' Objections to Order and Report–Recommendation ("Defendants' Objections") at 5.

**13.** Rule 803(6) is what is commonly referred to as the business records exception to the hearsay rule. That rule states, in relevant part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted

by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed.R.Evid. 803(6).

**14.** Timothy Jaroch was counsel for the mortgagor on the purchase of the SA & K building. His entire deposition was received into evidence at the August 29, 1990, hearing.

tions at 3 n. 1. While contemporaneous objections are obviously preferred, given the procedural posture of this case (*de novo* review of a magistrate judge's report-recommendation), the court will not bar defendants from now objecting to the Ticor letter.

■ In the Second Circuit "the principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Saks Intern., Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir.1987) (citations omitted). Trustworthiness is not the only precondition to admission under Rule 803(6), however. *United States v. Freidin*, 849 F.2d 716, 722 (2d Cir.1988). As specifically required by Rule 803(6), before a document will be admitted thereunder, it must be shown that that document was "kept in the course of a regularly conducted business activity...." Fed.R.Evid. 803(6). There must also be a showing that it was the "regular practice of that business activity to make the memorandum...." *Id.* Further, all of this must be shown by the "testimony of the custodian or other qualified witness" of the record. *Id.* But "there is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person." *Saks*, 817 F.2d at 1013 (citations omitted).

■ In *Freidin*, the Second Circuit, by its own admission, "strictly" read the regular practice requirement of Rule 803(6). *Freidin*, 849 F.2d at 720. Recognizing the "generous view" of Rule 803(6) which this Circuit has usually taken, the Court, albeit reluctantly, held that a memorandum found in the file of defendant's employer was inadmissible because there was no showing that that document was made pursuant to a regular practice of the employer. *Id.* at 723. In so holding, the Court emphasized the fact that originally Rule 803(6) did not contain the clause "and if it was the regular practice of that business activity to make the memorandum,...." *Id.* at 721 n.

2. Congress made this addition. Thus, even though the *Freidin* Court clearly stated that "[w]e believe the better rule would permit admission ..." of the contested document, the Court could not ignore the fact that Congress had chosen to add the regular practice requirement. *Id.*

The Second Circuit has continued to adhere to the regular practice requirement as is evidenced by the more recent case of *Fagiola v. National Gypsum Co. AC & S, Inc.*, 906 F.2d 53 (2d Cir.1990). In *Fagiola*, in *dicta*, the Court implied that the business records at issue therein could not have been admitted under Rule 803(6) because the trial record was devoid of any evidence that those documents "were kept in the course of a regularly conducted business activity and that it was the regular practice of the business to make such records." *Id.* at 59. *See also Dell Pub. Co. v. Whedon*, 577 F.Supp. 1459, 1464 n. 5 (S.D.N.Y.1984) (refusing to allow documents to be admitted under Rule 803(6) where foundation witness could not personally vouch that such documents were kept in the regular course of business).

In the present case, the Magistrate obviously relied on Rule 803(6) as the basis for considering the Ticor letter. *See* Report at 9–10. The Magistrate found the Ticor letter reliable based upon supporting evidence of "[t]he wire transfer of $610,000.00 from the bank." *Id.* at 10. The Magistrate failed to take into account, however, that even though the Ticor letter may have had sufficient indicia of trustworthiness, the other preconditions to admissibility under Rule 803(6) were not present.

First, there is nothing in the record to support the Magistrate's assertion that the Ticor letter may be considered as a business record because "[i]t was generated in the ordinary course of Ticor's business as a statement of how it disbursed funds to a request from Task,...." *Id.* Although it might be inferred that the Ticor letter was "kept in the course of a regularly conducted business activity" of Ticor, Fed.R.Evid. 803(6), in the opinion of this court, given the strict manner in which Rule 803(6) has been construed by the Second Circuit, such

an inference would not be sufficient to comport with the Second Circuit's stringent regular practice requirement. Second, it is undisputed that there is no direct evidence in the record showing that it was Ticor's regular practice to draft such a letter. In fact, the only evidence in the record directly pertaining to exhibit 47 is the deposition testimony of Timothy Jaroch where, when asked if he had seen the Ticor letter before, he replied: "I don't believe so." Exhibit 50 (Deposition of Timothy Jaroch (June 27, 1990) at 57, line 21). Therefore, because there was an insufficient foundation for receipt of the Ticor letter as a business record, the court agrees with the defendants that it was improper for the Magistrate to rely upon that document in finding a purchase price of $610,000.00.[15] That is not to say, however, that the finding of an initial purchase price of $610,000.00 is necessarily improper. The court cannot make that determination without examining the other evidence properly before the Magistrate, as well as the parties' remaining objections.

## 2. Transfer Tax Stamp

To fully understand the defendants' next objection (and others), it is necessary to carefully examine exactly how the purchase of the SA & K building was structured. Acquisition of the SA & K building was complicated somewhat by the fact that Task purchased that property through what is commonly referred to in the real estate trade as a flip transaction. As Mr. Jaroch testified at his deposition, flip transactions can be structured in one of two ways. Ex. 50 at 19. In the present case, the transaction was structured so that the original seller, Clement J. Colucci, Jr., sold the SA & K building to Tarbert Realty, Inc. ("Tarbert"), which in turn contracted to sell the building to Task for an amount greater than that which Tarbert paid to Mr. Colucci. See id. at 18–21.

The land sale contract between Tarbert and Task states a purchase price of $850,-000.00. Ex. 42 at 2, ¶ 2. The $850,000.00 purchase price quoted in that contract can be explained by scrutinizing paragraph 1(e) of the rider thereto. That paragraph states, inter alia, that Tarbert would prepare the tax form and that said form would show the consideration paid by Tarbert, pursuant to the underlying contract between Tarbert and Colucci to purchase the SA & K building. Id., Rider at 2, ¶ 1(e). That paragraph further states that any consideration above the amount set forth on the tax form (i.e. above $250,000.00) reflects the consideration for the assignment of the underlying contract of sale. Id.

■ At least at this point in the court's analysis, the most significant aspect of the transfer from Mr. Colucci to Task is the fact that on the deed referencing that transfer, dated October 2, 1984, and recorded October 3, 1984, there is a stamp indicating that $1,000.00 was received as real estate transfer tax in Onondaga County.[16] There was no actual testimony as to the relationship between the transfer tax stamp [17] and the purchase price. Therefore, based upon the Department of Taxation and Finance Central Office Audit Bureau Real Estate Transfer Tax form AU–205(4/83), maintained at the Onondaga County Clerk's Office, the court takes judicial notice [18] of the fact that the $1,000.00

---

15. Having determined that the Magistrate improperly considered the Ticor letter due to a lack of foundation, the court need not address the defendants' second argument that that letter did not state that the money was disbursed for the purchase of the SA & K building. The court notes, however, that it would be inclined to agree with the defendants that the Ticor letter was not probative of the purchase price of the SA & K building because that document, in and of itself, does not show that the $610,000.00 wired into Mr. Antell's account was actually expended for the purchase of the SA & K building.

16. Ex. 21.

17. There was only the comment by counsel for the FDIC, in summarizing the FDIC's proof, that applying the appropriate conversion table, that stamp indicates consideration in the amount of $250,000.00. Tape Recording (August 29, 1990).

18. The court may take judicial notice of this fact because it is an adjudicative fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2); see also Fed.R.Evid. 201(c).

transfer tax stamp represents that the consideration paid for the transfer of the SA & K building from Colucci to Task was $250,000.00.[19]

■ Despite the fact that the Magistrate expressly found that, "[r]ecorded documents may be considered as evidence of the purchase price," seemingly he did not consider the recorded deed of Colucci and Task in arriving at the proposed purchase price.[20] Report at 9. The defendants now vehemently argue that the Magistrate erred in not considering that deed, a recorded document, which shows (albeit indirectly) a purchase price of $250,000.00.[21]

Assuming *arguendo* that the deed was properly admissible for the purpose of proving a purchase price of $250,000.00, in the court's view, the Magistrate did not err by failing to rely on that document in determining the purchase price. That is so because even accepting the defendants' suggestion that the purchase price was $250,000.00, as represented by the $1,000.00 transfer tax stamp, the defendants did not come forth with any proof demonstrating that Yankee Bank loaned that same money to Task for the purpose of purchasing the SA & K building. Conse-

quently, evidence of the amount of transfer tax paid for the sale of the subject property was not and is not probative of the narrow issue before the Magistrate. Thus, when calculating the proposed purchase price, the Magistrate correctly declined to give any weight to that evidence.

*3. Equalization and Assessment Form*

■ Defendants raise two arguments with respect to the State of New York State Board of Equalization and Assessment Real Property Transfer Report ("the tax form"). The first is that the Magistrate should have given that document "substantial" weight in determining the purchase price.[22] Defendants' Objections at 7. The second argument, which will be addressed in the following section, is, in essence, that the Magistrate improperly relied upon the *D'Oench* doctrine as a basis for refusing to take into account the $250,000.00 purchase price as stated on the tax form.

Assuming, without holding, that the tax form was properly admissible,[23] the court concludes that the Magistrate properly decided not to afford that document any weight when calculating the purchase

19. This figure is derived by dividing by four the amount of tax paid ($1,000.00) and then multiplying the quotient (250) by $1,000.00.

20. The notion that the Magistrate did not consider proof of the deed with the transfer tax stamp thereon is bolstered by his statement that "[a]ll the recorded documentation and the building loan contract itself refer to either the $610,000.00 or the greater sum of $820,000.00 that constituted the agreed price between Tarbert Realty and Task Associates." Report at 9. Clearly if the Magistrate had examined that deed, also a recorded document, he would not have made that statement because the deed itself does not refer to either a $610,000.00 or a $820,000.00 purchase price.

21. A certified copy of that deed was offered by the FDIC and there were no objections to its receipt into evidence. Tape Recording (November 29, 1989).

22. The court observes that this objection assumes that the Magistrate allowed the tax form to be received into evidence. Perhaps because the defendants followed the somewhat unusual procedure of submitting a certified copy of the

tax form (along with a certified copy of the construction loan agreement), *after* the hearing, *see* Letter of Alfred W. Popkess to Thomas C. Buckle (September 4, 1990), this exhibit is not listed on the exhibit list; nor is there any specific mention in the report itself as to whether that document was ever in fact received into evidence. Arguably, based upon the Magistrate's comment that he "decline[d] to use the tax form.... as the definitive evidence of the price that was 'actually' expended for the purchase of the SA & K property," he did view the tax form as admissible evidence, but simply chose not to give it any weight. *See* Report at 9. It would greatly assist the court in the future, especially where evidence is received after a hearing, if it is specified in the report whether a document is admitted and the basis for its admission, instead of leaving the court to speculate.

23. The court has several reservations about the admissibility of this document. For example, if, as defendants urged in their memorandum of law, they were seeking admission of the tax form under Rule 803(6) (the business records exception), the lack of foundation with respect to the regular practice requirement would certainly be an obstacle to the admission of the tax form pursuant to that Rule.

price. As the Magistrate correctly pointed out, there is nothing in that form showing that it was signed by anyone from Task,[24] or, for that matter, by anyone from HSA–II. Nor is there any indication that someone from Yankee Bank signed that form. In addition, there was no evidence that whoever signed that form was authorized to do so on behalf of Task, HSA–II or Matthew Antell. Therefore, the form is not probative of how much truly was paid for the SA & K building. Furthermore, as with the transfer tax stamp, there is no evidence in the record connecting the $250,000.00 sale price reflected on the tax form to any monies loaned by Yankee Bank. Thus, the court finds that the Magistrate appropriately declined to give any weight to the tax form.

### B. D'Oench Doctrine

This objection, too, goes to whether the Magistrate should have considered the tax form in calculating the purchase price. The defendants asserted before the Magistrate that the sale of the SA & K building was structured to avoid taxes, and that the FDIC should not be permitted to benefit from that claimed impropriety. The Magistrate rejected that view explaining that the Bank did not execute the allegedly fraudulent tax form; and that "[t]he actual transactions were occurring in Syracuse, New York between other parties, not related to Yankee Bank in Boston Massachusetts [sic]." Report at 9. The Magistrate further reasoned that "to hold the FDIC responsible for whatever improper transac-

tion, would be to subvert all the existing policies that apply to the FDIC." *Id.* (citing *Langley,* 484 U.S. 86, 108 S.Ct. at 398). Thus, once again, the court is called upon to decide whether the *D'Oench* doctrine has any applicability here.[25]

As just discussed, because this court believes that the Magistrate properly disregarded that form, due to its lack of probative value on the narrow issue before the Magistrate, the court need not definitively decide whether the Magistrate improperly invoked the *D'Oench* doctrine. The court observes, however, that even if, as defendants submit, the Bank had knowledge of the flip transaction,[26] the Bank (and hence eventually the FDIC) did not have knowledge of the purported sale price of $250,000.00. While it is certainly plausible that the Bank had knowledge of the flip transaction based upon the documents detailed in footnote 26, nowhere in those documents is the $250,000.00 sale price mentioned. Indeed, the $250,000.00 sale price is not documented in or referred to in any way in the Bank records which were introduced as exhibits by the FDIC. There is plainly no evidence in the record as it is presently constituted indicating that the Bank had knowledge of that particular sale price. Thus, in all likelihood, it would, as the Magistrate suggested, contravene the *D'Oench* doctrine to hold the FDIC to the lower sale price of $250,000.00 when apparently there were no Bank records manifesting that price which would have put the Bank and/or the FDIC on notice of such

24. Report at 6.

25. As this court previously stated, "[t]he *D'Oench* doctrine takes its name from a 1942 Supreme Court decision—*D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed.2d [sic] 956 (1942)." *Yankee Bank II,* slip op. at 12, n. 2. In an earlier decision in this case, the court described that doctrine as a rule whereby "secret or unwritten agreements may not be raised as a defense to a suit by the FDIC because such agreements operate to deceive the banking authorities." *Yankee Bank III,* 731 F.Supp. at 68–69 (citing *Langley,* 484 U.S. at 92, 108 S.Ct. at 401–02). *Langley* is one of the more

recent Supreme Court cases discussing the application of the *D'Oench* doctrine.

26. According to the defendants, the Bank and thus the FDIC should have known of the flip transaction through the rider, which was attached to the contract of sale between Tarbert and Task. A certified copy of that contract, including the rider with a description of the flip transaction set forth therein, was provided to the Bank in response to the Bank's commitment letter. *See* Ex. 13 (Letter from Task to Home Savings enclosing executed purchase contract between Tarbert and Task (August 16, 1984)); and Ex. 12, ¶ 17 (Home Savings Bank Commitment Letter (August 15, 1984)).

price.[27]

## C. Offset Amounts

The next three objections all pertain to various amounts which defendants contend that the Magistrate should have deducted before arriving at the purchase price.

### 1. *Escrow Account*

■ As mentioned earlier, the Magistrate did not recommend an offset of $150,-000.00 (plus interest) against the purchase price. That sum represents the money which HSA–II placed in an escrow account with Yankee Bank in August, 1986. The Magistrate found that Yankee Bank did not engage in any impropriety when, after notice of default on both notes,[28] the Bank chose to apply the escrow funds to the payment of its loans, rather than obtain releases from the lienholders. In making that determination, the Magistrate referred to the letter of an attorney for HSA–II to Yankee Bank dated August 22, 1986 ("escrow agreement"). That escrow agreement indicates that HSA–II intended to deliver a bond and indemnity to Yankee Bank within 60 days of the date thereof. The escrow agreement further provided:

> If said bond and indemnity and title insurance are not delivered within 60 days, you shall continue to hold such deposit until such time as the above-described policy is delivered provided that if after said 60–day period and Event of Default ... exists, you may apply said amounts to the obligations of the undersigned to

you in such manner as you shall decide *or* you *may* use such proceeds to obtain release of any such liens on the property.

Ex. A (emphasis added).

Relying primarily upon the highlighted language, the Magistrate declined to recommend a reduction of the amount due based upon the existence of the $150,000.00 escrow account, reasoning that by the terms of that escrow agreement[29], it was the Bank's option to apply the escrow funds to HSA–II's outstanding loan obligations, instead of obtaining releases from lienholders, such as these defendants. The FDIC exercised that option as receiver for Yankee Bank in November, 1989, and applied the $150,000.00, plus $19,643.00 accrued interest, to the combined total principal and accrued interest on the two notes. Ex. 9; and Tape Recording (November 8, 1989). Significantly, when applying those funds, the FDIC did not distinguish between the outstanding obligations on the two notes or any portion thereof.

Defendants do not object to the fact that the Magistrate found no impropriety in the FDIC's application of the escrow account to HSA–II's outstanding loan obligations, as opposed to using those funds to obtain releases from the lienholders. Rather defendants' objection, which is well taken, is that once that application was made, the funds should have been attributed to the first advancement on the first note. In other words, defendants urge that the accounting principle known as "first in, first

---

**27.** The court is cognizant of the fact that in *Yankee Bank III,* it held "that the *D'Oench* doctrine is not implicated by the claims of the mechanic's lienors." 731 F.Supp. at 69. The general issue at that time was one of choice of law; and the more narrow issue was whether the FDIC could rely upon the *D'Oench* doctrine as a defense to a claim by the mechanic's lienors that Yankee Bank violated § 22 of the New York Lien Law "when it advanced funds on the SA & K project without first securing a surety payment bond from the real estate developers for the protection of the subcontractors." *Id.* at 68.

The court does not believe that if it were to actually hold here today that the *D'Oench* doctrine bars defendants' reliance upon the tax form, such holding would be inconsistent with that earlier decision. The court does not per-

ceive of any inconsistency because *Yankee Bank III* involved these same defendants trying to assert a defense against the FDIC based upon a written agreement (the construction loan agreement between Home Bank and Task); whereas the defendants are now seeking to hold the FDIC to a lower sale price based upon documents, which while written, were not agreements to which the Bank was a party; and, of at least equal importance, the terms of which (specifically the $250,000.00 purchase price) the Bank had no knowledge.

**28.** Exs. 37 and 38.

**29.** That escrow agreement appears to have been signed by Timothy Jaroch, attorney for HSA–II; and it was also "assented to" by someone from Yankee Bank. *See* Ex. A.

out" ("FIFO") should govern here. Simply put, when the FIFO principle is employed, the earliest payments are applied to the earliest debt. *See Susi v. Belle Acton Stables, Inc.,* 267 F.Supp. 293, 295 (S.D.N.Y.1967); *Warren Bros. Co. v. Sentry Ins.,* 13 Mass.App.Ct. 431, 433, 433 N.E.2d 1253, 1255 (1982);[30] *accord Beyer Bros. of Long Island Corp. v. Kowalevich,* 89 A.D.2d 1005, 1006, 454 N.Y.S.2d 444, 445 (2nd Dep't 1982) (citations omitted) ("[T]he funds will be applied to the debts in the order of time in which they stand in the account....").

In addition to relying upon the FIFO accounting method, defendants rely upon several cases discussing the rights of creditors and debtors upon payment. More particularly, defendants recite the generally accepted rule that "[w]here there are several outstanding debts a debtor has the primary power to direct the application of a payment." *Warren Bros.,* 13 Mass.App. Ct. at 433, 433 N.E.2d at 1255. "If he fails to exercise this right before or at the time of the payment, the creditor is then free to appropriate the money to any of the debts, as he chooses and without concern for the debtor's interests." *Id.; see also United States v. Pollack,* 370 F.2d 79, 80 (2d Cir. 1966). The creditor's right to appropriate such monies is not completely unfettered, however. Thus, as defendants rightly point out, "[e]ven when a secured creditor has a right to allocate a payment among various obligations, its allocation may not impair the rights of intervening secured creditors." *In re Custer,* 88 B.R. 573, 575 (Bankr.D.Conn.1988); *see also Pollack,* 370 F.2d at 80 (emphasis added) ("*[I]n the absence of any other creditor who would be prejudiced by such an allocation,* the courts must respect this right [to apply monies received from the debtor so as to

give the creditor the utmost advantage] of a secured creditor.")

The court agrees with the Magistrate that in accordance with the unequivocal terms of the letter agreement between HSA–II and Yankee Bank regarding the escrow account, it was permissible for the FDIC (on behalf of Yankee Bank) to apply the funds in the escrow account to HSA–II's outstanding loan obligations. The court does not believe though, as is implicit in the Report, that the FDIC had the right to apply those funds to HSA–II's outstanding loan obligations in any manner chosen by the FDIC, without regard for when those debts were accrued, and without regard for the rights of the mechanic's lienors. First of all, not permitting an offset of the $169,643.00 escrow funds would violate the rule just stated that a creditor may not allocate payment so as to impair the rights of other intervening creditors, such as these lienholders. This court has already determined that the FDIC has a first priority "*only up to* that amount actually expended toward the purchase of the SA & K building by Yankee Bank."[31] *Yankee Bank III,* 731 F.Supp. at 71–72 (emphasis added). The mechanic's lienors have a second priority lien on the remaining amount; and the FDIC is entitled to the remainder, if any. *Id.* As defendants astutely noted, not allowing this particular offset would effectively give the FDIC an additional priority beyond that intended by this court's prior decision in *Yankee Bank III,* and would, from a practical standpoint, thus impair the rights of the mechanic's lienors.

Further, and equally persuasive, is the defendants' argument that under FIFO the escrow account funds must be applied to the lien with first priority, which is certainly the FDIC's mortgage lien. It is undisputed that the first advancement under the

---

**30.** The mortgage note dated October 1, 1984, expressly provides that it is to be governed by the laws of the Commonwealth of Massachusetts. *See* Ex. 4 at 3. (Incidentally, the two promissory notes executed on April 23, 1986, contain that same proviso. *See* Exs. 5 and 6.)

**31.** Obviously Yankee Bank itself did not actually expend the money to purchase the SA & K building; rather it initially loaned the money to

Task, which in turn purchased the building. The court's intention in *Yankee Bank III* which, judging by the focus of the hearing before the Magistrate, the parties understood, was that the Magistrate make a finding with respect to the amount of money loaned by Yankee Bank which was actually expended to purchase the SA & K building.

construction loan agreement to the defendant developers was $610,000.00;[32] it is also undisputed that at least some of that $610,000.00 was disbursed for the purchase of the SA & K building. Thus, when the FDIC applied or attributed the escrow funds, based upon the FIFO method, those funds should have been applied to the $610,000.00 because that was undeniably the earliest debt on the loans. For these reasons, the court concludes that the defendant lienholders are entitled to have the $169,643.00 escrow monies offset against the purchase price.

### 2. Down Payment

■ Defendants also contend that the Magistrate should have allowed an offset of $40,000.00, which they describe as the down payment on the subject property. *See* Defendants' Objections at 10. That amount was payable at the closing, *see* Ex. 42 at 2, ¶ 2; and Antell provided the seller's attorney with a check in that amount on the closing date. Ex. 43. There is absolutely nothing in the record reflecting that Yankee Bank loaned those funds to Antell; and indeed that money was paid on July 31, 1984—two full months prior to the time the notes were executed. Although the Magistrate recognized that the $40,000.00 did not come from funds advanced by Yankee Bank, nonetheless, he flatly stated that a reduction of that amount "would not be appropriate." Report at 13.

The court cannot agree. In *Yankee Bank III*, this court held that the plaintiff FDIC had a first priority in the foreclosure sale proceeds *loaned by Yankee Bank* for the purchase of the SA & K building. 731 F.Supp. at 71–72. The court did not hold that the FDIC had a first priority in all money used to purchase the SA & K building, regardless of the source. Given the uncontroverted fact that the $40,000.00 did not come from monies provided by Yankee

Bank, that amount must be offset against the purchase price.[33] The court recognizes that this offset, standing alone, will most likely not inure to defendants' benefit given the limited amount of funds available as foreclosure sale proceeds ($505,000.00 plus interest). Nevertheless, in light of this court's prior holding and the narrow issue before the Magistrate, the court believes that, consistent with its decision in *Yankee Bank III*, this offset should be allowed. Thus, once the purchase price is judicially determined, an offset of $40,000.00 will be allowed.

### 3. Payment on Principal

■ The third and final offset sought by the defendants is for the $65,000.00 Matthew Antell supposedly paid on the principal in 1986. The Magistrate summarily found no support for such an offset. *See* Report at 14.

The court is perplexed as to how the defendants arrived at this $65,000.00 figure. Defendants refer to four exhibits which they claim support this amount. Careful examination of those exhibits demonstrates, however, that two of the exhibits (9 and 30) do not, on their face, show a repayment on the principal which would correlate with this amount. The other two exhibits referred to by defendants do show repayment on the principal, but only in the combined total amount of $26,000.00. *See* Exs. 40 and 41. Furthermore, those exhibits (40 and 41) were only marked for identification; they were not received into evidence. Thus, exhibits 40 and 41 are not appropriate for the court's consideration.[34] In reviewing the record, the court did discover admissible proof, though, that $26,000.00 was in fact paid on the principal on July 24, 1986. Ex. 34 (Letter from Yankee Bank to Matthew Antell (August 8, 1986), attachment thereto). Consequently, al-

---

**32.** *See, e.g.,* Ex. 2 at 1.

**33.** Indeed, the FDIC basically concedes that the initial $40,000.00 should be excepted from the purchase price ultimately determined by the court. *See* FDIC Post Hearing Memorandum of Law (September 21, 1990) at 8 and 12.

**34.** The court observes that another exhibit not referenced by defendants, exhibit 39, shows an additional payment on the principal by Antell in the amount of $26,000.00. *See* Ex. 39. That document was not received into evidence either, however, and therefore is also not proper for the court's consideration.

though the court agrees with the defendants that the FIFO method should also be used to allow this offset, the court disagrees as to the amount. Because the admissible proof demonstrates a $26,000.00 payment on the principal, the court will only allow an offset for that amount, and not in the greater amount sought by defendants.

To summarize, insofar as the various offsets sought by the defendants are concerned, the court has determined that any purchase price must be reduced by $169,-643.00 (the escrow fund plus interest) and by the $40,000.00 down payment. An offset should also be allowed for payment on the principal, but only in the amount of $26,000.00.

## III. FDIC's Objections

### A. Interest

 After recommending that the FDIC be awarded $464,172.02 as its first priority lien, the Magistrate recommended that the FDIC also be awarded post judgment interest on that amount calculated from the date of the judgment of foreclosure. *See* Report at 14, n. 3. The FDIC first contends that because the court has already decided the method by which the interest accrued on the mortgage indebtedness should be calculated, principles of *res judicata* bar the Magistrate from redetermining that issue. The FDIC next contends that "[h]aving subordinated the mortgage lien of Plaintiff's principal to a certain extent, the Court cannot now take away the interest accruing on that sum as part of its priority lien." Plaintiff's Objections at 2.

The court is bothered by the FDIC's reliance upon the doctrine of *res judicata*. It appears as though the FDIC is confusing *res judicata* and collateral estoppel. The distinction between the two is often over-looked by litigants. Very basically, *res judicata* involves claim preclusion, whereas collateral estoppel involves issue preclusion. *See generally In re PCH Assoc.*, 949 F.2d 585, 593–94 (2d Cir.1991) (discussing elements of both *res judicata* and collateral estoppel). The FDIC is essentially arguing that because the issue of interest on the mortgage indebtedness was already decided by the court, the Magistrate is precluded from reconsidering that issue. Therefore, assuming for the moment the applicability of either of those two doctrines, collateral estoppel and not *res judicata* should probably form the basis for the FDIC's argument,[35] because the FDIC is asserting issue preclusion and not claim preclusion.

The court interprets the report as addressing solely the issue of post judgment interest, and not the issue of interest on the mortgage indebtedness. As the FDIC accurately states, it was the latter issue which was previously before the court in *Yankee Bank III. See* 731 F.Supp. at 72. Therefore, because the Magistrate considered the issue of post judgment interest, an issue not previously addressed by the court in this litigation, collateral estoppel has no relevance here.

Aside from post judgment interest, the report is, for the most part, silent on the issue of interest.[36] Apparently the FDIC reads that silence as recommending, or at least suggesting, that the FDIC is somehow not entitled to the interest on the SA & K purchase price. This court has already held to the contrary, however. *See Yankee Bank III*, 731 F.Supp. at 72. The court will abide by its prior decision. The FDIC should therefore be awarded interest on the purchase price in conformity with this court's decision in *Yankee Bank III.* That means that the FDIC is entitled to an interest award on the purchase price at the

---

**35.** It is also possible that the FDIC intended to rely upon the law of the case doctrine. One branch of that doctrine "is that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir.1991). But because the FDIC did not specifically refer to this doc-

trine, the court need not speculate as to its relevance herein.

**36.** The Magistrate did comment, "This court has found that prejudgment interest was previously calculated on the total amount of the debt remaining on the two loans." Report at 14, n. 3.

contractual rate from the default date until October 10, 1989—the filing date of the foreclosure sale order. *Id.* The FIDC is also entitled to an award of post judgment interest from that date onwards. *Id.*

There were no specific objections to the proposed finding regarding post judgment interest; and, for the reasons set forth by the Magistrate, the court agrees that such an award is appropriate. To summarize then, the court concurs with the Magistrate that the FDIC is entitled to post judgment interest accruing from October 10, 1989, on the amount found to be actually expended for purchasing the SA & K building. In addition, the court finds that the FDIC is also entitled to interest (arising from the mortgage indebtedness itself) on the SA & K purchase price, calculated in accordance with *Yankee Bank III.*

**B. Purchase Money Mortgage**

■ The record clearly establishes that there was a recorded purchase money mortgage [37] for $420,000.00. Ex. 46. The Magistrate refused to consider that amount as part of the purchase price, however, on the basis that apparently that mortgage was satisfied with funds from the second note. The FDIC objects to this finding arguing that the Magistrate should have accounted for the purchase money mortgage as part of the purchase price because "[t]here is no dispute that the repayment of the purchase money mortgage came from Yankee Bank as Mortgagee." Plaintiff's Objections at 2–3. The FDIC further explains that in its view:

> The Magistrate incorrectly viewed the source of repayment of the purchase money mortgage as arising from two loans. The first priority lien of the mortgagee was not subordinated because of 'two loans'; but rather, because of a claimed failure to comply with the conditions of the filed loan agreements.

*Id.* at 2.

The court is in agreement with the FDIC's characterization of the reason for subordination. The FDIC's priority was subordinated to a certain extent because Yankee Bank effectively modified the construction loan agreement, but never filed a modification. Even if, as the FDIC contends, the Magistrate did not consider the true reason for subordination (failing to file a modification of the construction loan agreement), that is not a sufficient basis upon which to disregard the ultimate determination reached by the Magistrate. Specifically, he recommended that the purchase money mortgage not be included as part of the purchase price because *Yankee Bank III* did not contemplate a purchase price greater than $610,000.00. *See* 731 F.Supp. at 70–71. The Magistrate's reading of *Yankee Bank III* is correct. Thus, there is no merit to this objection by the FDIC.

**IV. Purchase Price Analysis**

■ Given the fact that, as previously discussed, this court is required to conduct a *de novo* review of the report recommendation the court will now engage in an independent evaluation of the purchase price based upon those documents properly in evidence, and the admissible testimony of Robert Sellers.

As the Magistrate correctly stated, direct or circumstantial evidence may be used to establish payment. *See In re Sabre Shipping Corp.*, 299 F.Supp. 97, 99–100 (S.D.N.Y.1969). The Magistrate also properly stated, and the parties do not dispute, that the burden of proof is on the party asserting that payment has been made. *Federal Deposit Ins. Corp. v. Waldron*, 630 F.2d 239, 241 (4th Cir.1980); *Central Stone Co. v. John Ruggiero, Inc.*, 49 Misc.2d 622, 623, 268 N.Y.S.2d 172, 173 (Dist.Ct.Nassau Co., 3rd Dist.1966). Therefore, in the present case, because all parties are claiming payment in varying amounts, each party has the burden of

---

**37.** "A purchase-money mortgage is generally defined as 'a mortgage executed at the time of purchase of the land and contemporaneously with the acquisition of the legal title, or afterward, but as part of the same transaction, to secure an unpaid balance of the purchase price'...." *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 47, 499 N.Y.S.2d 650, 653, 490 N.E.2d 517, 520 (1986).

proof with respect to the amount of the claimed payment.

Before determining the amount actually expended for the purchase of the SA & K building, the court will outline the relevant proof. First there is the mortgage to secure a $2,600,000.00 loan. It explicitly states that $1,990,000.00 of that amount was advanced pursuant to the construction loan agreement, and that the balance of $610,000.00 was advanced immediately.[38] Ex. 2. Consistent with that notation, there are also exhibits showing that Home Bank transferred by wire $610,000.00 one day after the mortgage was executed. *See* Exs. 18 and 30. Read alone, however, those requests for fund transfers in the amount of $610,000.00 do not relate to the purchase of the SA & K building. Robert Sellers' testimony is helpful in this regard. When questioned on cross-examination about exhibit 30, he explained that the $610,000.00 was transferred to the title company in connection with the SA & K transaction. Tape Recording (November 29, 1989 hearing). He likewise testified that the $610,000.00 wire transfer referred to in exhibit 18 was a transfer to the title company. *Id.*

In addition to the evidence of the $610,-000.00 wire transfer, there is also proof that the day after the first mortgage was executed the first disbursement was made, in the amount of $610,000.00.[39] *See* Ex. 33 (Letter from Yankee Bank to Antell (May, 1986), attachment thereto); *see also* Ex. 10 ("Schedule of Disbursements"). Furthermore a document entitled "Requisition for Payment No. 1" shows "closing proceeds" deducted from the initial $2,600,000.00 loan in the amount of $610,000.00. Ex. 29.

There is other documentary evidence which the court cannot ignore, and that is the evidence purportedly showing purchase prices different than $610,000.00. The first is a letter dated August 11, 1984—less than one month prior to the date for closing on the SA & K building. The letter is from Matthew Antell to Home Bank giving what appears to be a breakdown of costs associated with acquisition of the SA & K building. That letter indicates the following:

S.A. & K. Building

| | |
|---|---|
| Borrower: | Hanover Square Associates—Two, Limited Partnership |
| Seller: | Tarbert Realty Inc. |
| Property: | S.A. & K. Building |

| Item | Amount |
|---|---|
| Seller: | $480,000 |
| Bank Points | 52,150 |
| Appraisals & Other | 42,400 |
| Aquisition [sic] Costs | -- |
| Legal Costs | 5,000 |
| | ----------- |
| | $579,550 |

Ex. 14. Yet a different purchase price is reflected in the purchase contract between Tarbert and Task. That contract shows a total purchase price of $850,000.00. Ex. 42

38. The court observes that this notation is handwritten and there was no testimony as to whose handwriting is on the document. The parties have not challenged in any way the veracity of this statement, however.

39. The court is aware that some documents show a $610,000.00 advancement on October 1, 1984, and some indicate that same $610,000.00 advancement on October 2, 1984. The court does not deem that minor discrepancy significant.

at 2. And finally, in a document entitled "Ultimate Transaction," the "sales price" is shown as $820,000.00. Ex. 45. The discrepancy between that figure and the $850,000.00 price in the purchase contract is easily explained. The "Ultimate Transaction" expressly states:

> The purchase price of the contract in the ultimate transaction, after due negotiation, was reduced to the sum of $820,000.00 which sum was reflected in the reduction of the purchase money mortgage. Accordingly, the adjustments herein reflect such change.

*Id.*

For the reasons set forth herein, the court does not find credible the evidence offered by defendants, which they believe shows a significantly lower purchase price of $250,000.00. Thus, when all is said and done, the court is left with three supposed purchase prices: $579,550.00, $610,000.00 or $820,000.00. Of those three figures, because there is at least some evidence, albeit inferential, that Yankee Bank did indeed loan the $610,000.00 amount to Task and/or Antell on or near the closing date, and because there is no similar evidence with respect to the other figures, the court finds that $610,000.00 was the amount advanced by Yankee Bank for the purchase of the SA & K building.

Obviously, the court's analysis cannot end there because that sum must be reduced by $39,500.00—the amount the FDIC apparently concedes was not spent for acquisition of the property, but for a management fee and a non compete agreement. *See* Report at 11. Unlike the Magistrate, the court will not allow a reduction for the additional sum of $106,327.98. The Magistrate allowed that deduction based upon the Ticor letter, which does plainly state that of the initial $610,000.00 wired into the account of Matthew Antell, $106,327.98 was distributed to Task. Ex. 47. As discussed herein, that exhibit was not admissible and thus the court declines to reduce the purchase price by $106,327.98 because there is no admissible evidence to support such reduction.

Allowing the $39,500.00 reduction, the purchase price would be $570,500.00, without taking into account the various offsets which, upon review, this court has decided are appropriate. The first allowable offset is in the amount of $169,643.00 for the escrow account funds, plus the interest thereon. The second offset is for the $40,000.00 down payment; and the third is for the $26,000.00 payment on the principal. After these offsets, combined with the $39,500.00 reduction conceded by the FDIC, the court find that the amount loaned by Yankee Bank and actually expended toward the purchase price of the SA & K building was $346,857.00.

The FDIC is entitled to that amount from the foreclosure sale proceeds, with interest thereon calculated from October 10, 1989—the date of the judgment of foreclosure and sale. The FDIC is also entitled to interest thereon in conformity with the court's *Yankee Bank III* decision. The remainder of the foreclosure sale proceeds, if any, are to be distributed among the mechanic's lienors based upon their priorities. To be comprehensive, even though the possibility of any remaining funds after that seems nonexistent, if per chance, there are any remaining monies, the FDIC would also be entitled to those.

For the reasons set forth herein, the court declines to adopt the proposed findings of Magistrate Judge DiBianco; and instead orders that the foreclosure sale proceeds in this action, which are currently being held in a trust account, be disbursed by Referee Robert Woodford in accordance with this opinion. The Referee is further directed to file with the court a report within thirty (30) days of the date of entry of this order showing compliance herewith.

IT IS SO ORDERED.